# 2013 UT App 133

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
HUSSEIN GEDI,
Defendant and Appellant.

Memorandum Decision
No. 20111099-CA
Filed May 23, 2013

Third District, Salt Lake Department
The Honorable Judith S.H. Atherton
No. 111901194

Craig L. Pankratz and David M. Corbett, Attorneys
for Appellant
John E. Swallow and Brett J. DelPorto, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Memorandum Decision, in
which JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR.
concurred.

ROTH, Judge:

¶1     Defendant Hussein Gedi appeals his convictions by jury for
violation of a domestic violence protective order and threat of
domestic violence. Gedi argues that his trial counsel rendered
ineffective assistance by opening the door to testimony about
Gedi's prior domestic violence conviction. We affirm.

¶2     Gedi's girlfriend (Girlfriend) obtained a domestic violence
protective order against him in February 2010 based on Gedi's
abuse of her in January 2010. At trial, the issue was whether Gedi

had violated that protective order by going to Girlfriend's family's home and whether, at the home, he threatened to kill her family if she did not leave with him. At trial, Gedi and Girlfriend offered contradictory testimony.

¶3     Girlfriend testified that after the protective order was issued and while it was still in force, she and Gedi had briefly reconciled in July 2010 after he had "bugged" her on several occasions while she was living at her parents' home in West Valley City. The two lived together at Gedi's home in Logan for a couple of days without incident until they got into an argument over cigarettes. Gedi had refused to buy cigarettes for Girlfriend, and she left his house on foot to "bum a cigarette" off someone. Gedi followed Girlfriend in his car, talked her into the car, and started to take her back to his house. Girlfriend became afraid that Gedi would hit her when they got back to his house, explaining, "I already know what happens when we go back to the house. He's going to end up hitting me inside the house." So rather than return to the house with Gedi, Girlfriend jumped out of the moving vehicle. When Girlfriend was later treated for her injuries by a doctor, Gedi accompanied her and told the doctor that she had been in a bicycle accident.

¶4     After that incident, Girlfriend resolved to leave Gedi but was afraid to try to do so when Gedi was home, explaining, "[H]e has slammed me against the wall to not leave." So she instead waited until Gedi was at work, took his vehicle, and left. Girlfriend met up with her sister and they drove to Salt Lake City where they left Gedi's vehicle at his mother's house and then returned to their parents' house in West Valley City. During this time, Gedi repeatedly called Girlfriend, saying that he was coming to get her and that if she did not go with him he was going to hurt or kill her family. During at least one of the calls, Girlfriend put Gedi on speaker phone so her sister could also hear the conversation.

¶5     At some point Girlfriend realized that she and Gedi had inadvertently switched cell phones, so she agreed that Gedi could

come to her parents' house to exchange phones. When Gedi arrived at her parents' home, Girlfriend was waiting on the front porch with her sister, her brother, and a cousin. After a time, Girlfriend's mother and stepfather also arrived at the house. Gedi and Girlfriend argued for a while. Girlfriend told him to leave while Gedi repeated his threats that if she did not leave with him he would kill her family. Eventually, Girlfriend's sister called the police. When he realized the police had been called, Gedi hurried to his car and drove off. Girlfriend's sister and stepfather also testified consistently with Girlfriend's testimony.

¶6     Gedi, however, testified that he had not seen and had not had any contact with Girlfriend since the protective order had been issued in February 2010. According to him, he and Girlfriend did not reconcile at his urging in July 2010, she never returned to live with him in Logan, they did not have a fight about cigarettes, she did not jump out of his moving car, and he did not drive to her parents' house and threaten her and her family. Rather, according to Gedi, after approximately five months without any contact, Girlfriend went to his house in Logan while he was at work and stole one of his cars and his cell phone. When asked why she and her family would tell such a story so at odds with his own, Gedi explained that Girlfriend and her family were "all just making this up" and were lying because they did not like him, in part because he had refused to convert from Islam to Mormonism and also because Girlfriend had told her family in the past that he had abused her.

¶7     During his direct examination, Gedi's counsel asked him about the January 2010 incident that led Girlfriend to obtain the protective order. In a somewhat rambling response that his counsel did not interrupt, Gedi explained that Girlfriend was jealous and did not like him coming home late or his efforts to keep her from smoking and doing drugs, which he insinuated led to a fight that in turn led to the issuance of the protective order. On cross-examination, the State asked Gedi for more details about the January 2010 incident. Specifically, the State elicited testimony that

Gedi had pleaded guilty to domestic violence assault and criminal mischief for punching a car window. Because of this incident, Girlfriend applied for, and Gedi stipulated to the issuance of, the protective order. Then on redirect examination, Gedi's counsel elicited an explanation from Gedi that he had pleaded guilty to the assault and criminal mischief charges because he was guilty but had not pleaded guilty to charges he was currently being tried for because he was not guilty:

> [Trial Counsel]: And you testified to the jury that you pled guilty to assault and criminal mischief.
>
> [Gedi]: Yes.
>
> . . .
>
> [Trial Counsel]: [Y]ou pled guilty to it because you are guilty of it?
>
> [Gedi]: Yes. I did it. . . .
>
> [Trial Counsel]: And you pled . . . not guilty[ here] because you are not guilty of this?
>
> [Gedi]: This one, the truth, I'm not [the one that] did it. But that one, I did it, and I take responsibility what I done . . . .
>
> [Trial Counsel]: So you're the kind of person that would plead guilty if you were guilty.
>
> [Gedi]: Yes.
>
> [Trial Counsel]: But you're not.
>
> [Gedi]: This one, no. I'm not.

The jury found Gedi guilty of the charged offenses. Gedi now appeals, arguing that his trial counsel rendered ineffective assistance.

¶8    In order to prevail on a claim for ineffective assistance, the defendant "'must show that counsel's performance was deficient'" and that counsel's "'deficient performance prejudiced the defense.'" *State v. Tennyson*, 850 P.2d 461, 465 (Utah Ct. App. 1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish that counsel's performance was deficient, the defendant "'must show that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). And in order to do so, the defendant must "overcome the strong presumption that counsel's performance fell 'within the wide range of reasonable professional assistance' and that 'under the circumstances, the challenged action might be considered sound trial strategy.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). In this regard, a reviewing court "need not come to a conclusion that counsel, in fact, had a specific strategy in mind" but instead "need only articulate some plausible strategic explanation for counsel's behavior." *Id.* at 468. To establish that counsel's performance was prejudicial, defendant must show that "there is a reasonable probability that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 466 (quoting *Strickland*, 466 U.S. at 694). Failure to establish either prong is fatal to a claim for ineffective assistance. *See id.*

¶9    Gedi claims that his trial counsel rendered ineffective assistance by opening the door to otherwise inadmissible testimony about the January 2010 incident that led to the issuance of the domestic violence protective order and his related domestic violence and criminal mischief convictions.[1] Gedi argues that

---

[1]The State does not challenge Gedi's assertion that the evidence was inadmissible, and we therefore do not reach the

counsel's performance was deficient because no reasonable trial strategy justified its admission. Gedi also argues that he was prejudiced by the admission of this evidence because the jury was presented with a credibility contest between the testimony offered by him and the testimonies offered by Girlfriend and her family. According to Gedi, the evidence about this underlying act of domestic violence destroyed his credibility and prevented the jury from believing his testimony over Girlfriend's.

¶10     We conclude that Gedi's trial counsel's performance was not deficient. At trial, Gedi's chosen defense placed him in a very difficult position. There was no dispute that Girlfriend had been granted a domestic violence protective order against him, and Gedi took the position that he had not seen or spoken to her since it was issued. His explanation for the charges brought against him was that five months after the protective order was issued, Girlfriend, for no apparent reason, had traveled to Logan, entered his house while he was at work and took his cell phone and car, then drove directly to his mother's house in Salt Lake City where she left the car. Gedi's testimony was uncorroborated and contradicted Girlfriend's testimony that Gedi contacted her frequently after the protective order was issued and that they ended up living together for a time in Logan before the renewed relationship deteriorated into further conflict. Gedi also contradicted Girlfriend's testimony that the ongoing conflict led her to take his car to escape him and return to her family's house in West Valley City after dropping off Gedi's car at his mother's house. In an effort to take her back, Gedi pursued her to her family's house where he threatened her and her family. Girlfriend's testimony was corroborated by the testimony of her sister and stepfather. Gedi's explanation for the contradictory testimony was that Girlfriend and her family were lying and that they had concocted this story five months after he had ceased all contact because he had not converted to Mormonism

---

[1](...continued)
issue.

as they had wished and because Girlfriend had told her family during their relationship that he had abused her.

¶11    Gedi's trial counsel faced the difficult task of portraying Gedi's implausible version of the events as more credible than the State's, and the only tool he apparently had to work with was Gedi's own credibility. While disclosure of a defendant's prior conviction is generally something defense counsel would seek to avoid, under these circumstances, such a risk could be seen as part of a plausible trial strategy, i.e., to attempt to make Gedi seem more credible by using his guilty plea to the charges that underlie the protective order to make the point that he had willingly taken responsibility for his actions when he was guilty and therefore was telling the truth now.[2] And the risk of revealing these prior convictions was somewhat mitigated by the fact that the jury knew that Girlfriend had a domestic violence protective order against Gedi. So disclosing the underlying January 2010 incident that had led to the issuance of the protective order may have prevented the jury from speculating, to Gedi's possible detriment, about the nature of the incident that led to the issuance of the protective

---

[2]Gedi's argument suggests that his counsel inadvertently let Gedi open the door to evidence about his prior convictions by not controlling Gedi's narrative answer to a question on direct examination. In other words, the strategy we describe as plausible was not counsel's deliberate choice but one he stumbled into by inadvertently opening the door and then tried to make the best of on redirect and in closing argument. Nevertheless, as we have discussed above, it is not necessary that we "come to a conclusion that counsel, in fact, had a specific strategy in mind," only that counsel's actions lend themselves to some "plausible strategic explanation." *See State v. Tennyson*, 850 P.2d 461, 465 (Utah Ct. App. 1993) (citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

order in the first place.[3] In asserting the importance of the credibility contest between his testimony and Girlfriend's, Gedi correctly points out that the jury may elect to believe the testimony of one witness over the testimonies of several witnesses and that family members may have a motivation to lie for each other. But under the facts of this case such considerations cannot be seen as so favorable to him that they would change the risk/benefit balance to the point of significantly undercutting the plausibility of the strategy we have described, especially when the jury knew that Girlfriend had already obtained a domestic violence protective order against Gedi. Finally, the facts elicited about Gedi's prior convictions were sparse and describe behavior less serious than what Girlfriend had already offered in her testimony about the circumstances underlying the charges tried. Thus, given the "strong presumption" that counsel's performance "'might be considered sound trial strategy'" and fall "'within the wide range of reasonable professional assistance,'" *see Tennyson*, 850 P.2d at 465 (quoting *Strickland*, 466 U.S. at 689), we conclude that Gedi's trial counsel's performance was not deficient. For similar reasons, we also conclude that Gedi was not prejudiced by his trial counsel's performance. *See Strickland*, 466 U.S. at 691–92, 694.

¶12    We affirm.

————————

[3]Gedi argues that if his trial counsel wished to alleviate the jury's curiosity about the reason for the domestic violence protective order, he could have simply elicited testimony that Girlfriend had requested a protective order and Gedi had stipulated to its issuance. However, had Gedi's trial counsel elicited such testimony, he would certainly have run the risk that it also would have been enough to open the door for the State to cross-examine Gedi about the underlying incident that had led to the protective order's issuance to counter the inference that he had done nothing to warrant the order.